```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA            :

     -v.-                           :
                                            10 Cr. 520 (SAS)
KENNETH STARR,                      :

          Defendant.                :

- - - - - - - - - - - - - - - - - -X
```

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

William Harrington
Michael Bosworth
Assistant United States Attorneys
     -Of Counsel-

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA          :

     -v.-                         :
                                          10 Cr. 520 (SAS)
KENNETH STARR,                    :

          Defendant.              :

- - - - - - - - - - - - - - - - -X
```

## INTRODUCTION

The Government respectfully submits this memorandum in connection with sentencing in this case, which is currently scheduled for Wednesday, March 2, 2011, at 4:30 P.M. For the reasons set forth below, the Government contends that in the defendant's case, a sentence within the applicable Guidelines range of 121 to 151 months would be sufficient, but not greater than necessary, to satisfy the factors set forth in Title 18, United States Code, Section 3553(a).

## BACKGROUND

For decades, Kenneth Starr, the defendant, served as a financial planner for, and investment adviser to, numerous clients including high net-worth businessmen and well-known celebrities. Through the two companies he controlled - Starr & Company, LLC and Starr Investment Advisers, LLC (collectively, Starr & Co.) - the defendant managed his clients' finances, paid their bills, advised them about their taxes, and made investments

-1-

on their behalf and for their benefit. In some cases, Starr assumed total control over his clients' financial lives by collecting their earnings, investing their savings, and paying their bills.

For years, however, the defendant also victimized his clients, criminally exploiting the trust they had placed in him in order to enrich himself, his family, his friends, and his business. Starr defrauded his clients by engaging in at least two different schemes. Because of his actions, Starr caused his clients great personal and financial harm.

First, between at least March 2009 up to and including in or about April 2010, the defendant stole millions of dollars from his clients through dozens of transactions. He did this by directing unauthorized transfers of funds from his clients' accounts to one of two attorney escrow accounts, and causing funds to be transferred from the attorney escrow account for his benefit. Among other things, Starr misappropriated funds from his clients in order to: (a) buy himself and his family a $7.5 million luxury condominium on the Upper East Side of Manhattan ("Luxury Apartment"); (b) cover operating expenses of Starr & Co; (c) repay clients who discovered Starr had stolen money from them; and (d) pay a $4 million legal settlement with a former client, a playwright and screenwriter who is in his 80s

("Playwright").[1] And Starr misappropriated the funds using the attorney escrow accounts in order to, among other things, conceal the true source of the funds as well as his unlawful activity.

Second, between 2005 and 2010, while serving as an investment adviser in Manhattan, Starr made material misstatements and/or material omissions in an effort to fraudulently induce his clients to make certain investments.

The Government and the defendant have reached an agreement regarding the precise loss amount for which the defendant should be held responsible. Specifically, the parties agree that the defendant should be held responsible for $33,312,782.69 in actual or intended loss, calculated as follows.

With respect to Victim # 1, a former hedge fund manager and well-known philanthropist, the defendant is responsible for a loss amount of $2,450,000. Starr misappropriated, from Victim #

---

[1] As set forth in paragraphs 19 and 20 of the Indictment, the defendant fraudulently induced the Playwright to (1) invest $4 million in a certain proposed restaurant chain; (2) invest $3,472,000 in a certain risky investment fund; (3) invest $1 million in another risky investment fund; and (4) invest $312,500 in a movie production company. In or about February 2009, Starr, Starr & Co. and other parties ultimately agreed to settle any claims the Playwright may have against them. Pursuant to that settlement agreement, as amended, Starr was required to, and did pay the Playwright $4 million in January 2010. Because the defendant returned money to the Playwright in connection with the above-described investments prior to the detection of the true scope and nature of the offense, the parties have agreed that these investments will not be included as part of the loss amount for which the defendant should be held responsible under the Guidelines. See United States Sentencing Guidelines Section 2B1.1, Application Note 3(E).

1 and/or a foundation she controlled, $1,700,000 in a series of 8 wire transfers that occurred between August 2009 and November 2009. The defendant also attempted to misappropriate an additional $750,000 in April 2010. The defendant did not succeed in misappropriating this additional $750,000 because Victim # 1 told a bank that had contacted her that she had not authorized the wire transfer.

With respect to Victim # 2, an actress, the defendant is responsible for a loss amount of $1,000,000. Starr misappropriated $1,000,000 from Victim # 2 on April 13, 2010, as part of a series of misappropriations that Starr made in order to pay for the Luxury Apartment. When Victim # 2 learned about the unauthorized wire transfer of $1,000,000, she confronted the defendant and, after giving a series of different explanations, he repaid her with $1,000,000 that he misappropriated from Victim # 3.

With respect to Victim # 3, the former executive of a talent agency, the defendant is responsible for a loss amount of $2,000,000. Starr misappropriated $1,000,000 from Victim # 3 on January 5, 2010, as part of a series of misappropriations that Starr made on that date to pay for his $4 million legal settlement with the Playwright. When Victim # 3 inquired about the purpose of the $1,000,000 transfer, Starr falsely told him that the money was being transferred to the attorney escrow

account so that the money could be aggregated and invested with a large bank. A monthly statement from Starr & Co. similarly and falsely reflected that the transfer was for an investment with the large bank. Starr misappropriated an additional $1,000,000 from Victim # 3 on April 26, 2010, in order to repay Victim # 2 for the $1,000,000 Starr had misappropriated from her.

With respect to Victim # 4, a step-son of the deceased heir of a business fortune who is in his 70s, the defendant is responsible for a loss amount of $3,210,282.69. Starr misappropriated these funds from Victim # 4 in a series of at least 10 wire transfers between at least June 2009 and April 2010. The defendant used the funds in order to purchase the Luxury Apartment as well as to cover Starr & Co. operating expenses.

With respect to Victim # 5, the now 100 year-old heiress to a business fortune, the defendant is responsible for a loss amount of $5,750,000. Starr misappropriated these funds from a limited liability company that Victim # 5 controlled in a series of 3 wire transfers between April 13, 2010, and April 16, 2010, in order to pay for the Luxury Apartment.

With respect to Victim # 6 , a well-known jeweler and his wife, the defendant is responsible for a loss amount of $9,700,000. Between in or about February 2008 and in or about October 2008, the defendant fraudulently induced this couple to

invest in 7 companies either by: (1) making material misrepresentations, for example, leading the couple to believe that they were investing $150,000 in a legitimate company called Wind River, LLC, when in fact the $150,000 was a loan to one of Starr's friends, Andrew Stein, and Wind River, LLC was simply a shell company that Starr had set up for a friend in order for Stein to pay his bills; or (2) making material omissions such as failing to disclose material conflicts of interest, including conflicts of interest relating to the defendant's wife, for example, one company in which Starr caused his clients to invest had agreed that Starr's wife would receive a position and equity share in the company in exchange for Starr's soliciting investments for the company.

With respect to <u>Victim # 7</u>, a film producer and businessman in his 70s, the defendant is responsible for a loss amount of $4,602,500. Starr misappropriated these funds from various trusts that Victim # 7 controlled in a series of at least 12 wire transfers between at least March 2009 and April 2010. The defendant used the money to pay the legal settlement with the Playwright, to cover operating expenses for Starr & Co., and to buy the Luxury Apartment.

With respect to <u>Victim # 8</u>, the ex-wife of a wealthy investor and businessman, the defendant is responsible for a loss amount of $4,500,000. Starr misappropriated these funds from a

foundation and/or a trust that Victim # 8 controlled in a series of 3 transfers between January 2010 and March 2010. The defendant used the funds to, among other things, pay the legal settlement with the Playwright.

With respect to Victim # 9, an actress in her 80s, the defendant is responsible for a loss of $100,000. Starr defrauded Victim # 9 by leading her to believe her investments were doing fine, when in fact the value of her investments (which were made using her retirement funds) was steadily declining.

In connection with the above described crimes, the defendant pled guilty, on September 10, 2010, to one count of wire fraud in violation of Title 18, United States Code, Section 1343 (Count Nine of the Indictment); one count of money laundering, in violation of Title 18, United States Code, Section 1956(a)(1) (Count Twenty One of the Indictment); and one count of fraud by an investment adviser, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17 (Count Twenty Two of the Indictment).

## ARGUMENT

The Government respectfully contends - as the Probation Office agreed in recommending a 151 month sentence, the top of the applicable Guidelines range - that a sentence within the range of 121 to 151 months' imprisonment would be reasonable and sufficient, but not greater than necessary, given (1) the nature

and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct.  See 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

Two things above all stand out about the nature and circumstances of the defendant's offenses.

First, the defendant defrauded his victims of a staggering amount of money.  As set forth above, and as the parties here agree, the defendant is responsible for $33,312,782.69 in loss. Of that sum, the lion's share was the product of outright theft by Starr.  And all but $750,000 of the loss amount for which the defendant is responsible represents *actual*, as opposed to intended loss, that is, Starr succeeded in his criminal schemes nearly every time.

Second, the defendant did not defraud mere third parties unknown to him.  On the contrary, Starr systematically defrauded his own longstanding clients, individuals who trusted him to advance their financial interests, not his own.  Some of these clients ceded near total control over their financial lives to Starr precisely because they trusted him so.  Starr flagrantly, deliberately, and repeatedly exploited that trust.  This is not a case in which the defendant aberrationally made "a mistake" or

experienced "a colossal" and solitary "error" as defense counsel submits. *See* Sentencing Memorandum dated February 8, 2011 at 8 (emphasis added). Rather in this case, time after time, Starr made one bad – and criminal – choice right after another. Indeed, as set forth above, the defendant committed outright theft from his clients dozens of times over a period of years.

Defense counsel argues that leniency is appropriate, *inter alia*, in light of the defendant's good character and history of good works; his ex-wife's failing health; and the fact that the defendant's conduct is out of keeping with the way he previously lived his life. The Government respectfully submits these are not grounds for a lenient sentence in this case.

For one thing, whatever other acts of charity and altruism the defendant may have performed in his life, it is clear that in this case the defendant serially victimized his clients in order to help *himself*. He committed these crimes to keep his company solvent, his personal finances flush, and an extravagant lifestyle for his family, including his new wife.

Additionally, the defendant's conduct can hardly be described as aberrational. The defendant may well have been a law-abiding man at some point in his life. But it seems that he reversed course within recent years, deliberately and continually committing crimes, and over a period of years. Had his Ponzi scheme not been nipped in the bud, there is no telling how long

his crimes would have continued.

Finally, there is no question that the defendant's ex-wife is suffering and that the defendant's incarceration will have an impact on the daughters they had together. By way of background, Starr had two daughters with his third wife. After that wife was diagnosed with a serious illness, Starr left her for his current wife and his daughters remained in his ex-wife's care. He provided financial support to his ex-wife through Starr & Co. and it is unlikely he will be able to continue to provide any such financial support to his ex-wife given, *inter alia*, the bankruptcy of Starr & Co. However tragic the defendant's family situation, it bears noting that the imprisonment of every defendant has an impact on his or her family. Fortunately for this defendant, the children he had with his ex-wife are nearly adults – one daughter is 16 years old and the other is 17 years old. Many defendants are not so lucky; they are sentenced to even longer periods of time than this defendant faces, and they leave much younger children or even infants in their wake. In any event, even the 60 month sentence suggested by defense counsel will have an impact on the defendant's family, and there is no compelling reason in this case for the defendant to receive leniency.

## RESTITUTION

The parties have also reached an agreement regarding

the restitution owed to victims, which requires the defendant to pay a total of $29,112,782.69. Although the Court has made clear that it will not issue any restitution order until after April 4, 2011, by which point any additional restitution claimants must make submissions to the Court, the Government wishes to set forth the terms of its agreement with the defendant. The Government notes that the defendant's assets are limited and that, even including the assets seized so far, the defendant's restitution obligations already dwarf the likely repayment, and it is likely that victims will receive only 10% or so of their losses.[2]

Consistent with the facts set forth above, the parties request that the Court adopt the following loss figures for restitution purposes.

| Victim # 3 | $ 2,000,000.00 |
| Victim # 4 | $ 3,210,282.69 |
| Victim # 5 | $ 5,750,000.00 |
| Victim # 6 | $ 8,950,000.00 |
| Victim # 7 | $ 4,602,500.00 |
| Victim # 8 | $ 4,500,000.00 |
| Victim # 9 | $   100,000.00 |

---

[2] The defendant, prior to his arrest, repaid certain fraud victims with monies belonging to other victims. The former may voluntarily surrender such monies (rather than face litigation) to a restitution pool that may be distributed pro rata among all victims. The Government is in continued discussions to that end. For now, the Government is not assigning any restitution amount to any victim repaid with other victims' money who has not already agreed to surrender the funds.

The parties will further request certain terms related to restitution but will do so in advance of any final restitution order. Additionally, in a non-public filing, the parties will disclose the investments included in the restitution figures and the identities of the victims to be included in the restitution order.

## CONCLUSION

In today's world, people of all walks of life depend on and trust financial advisers like Kenneth Starr to counsel them about how best to protect and provide for their families. Financial advisers who abuse that trust, who see their clients as bottomless cash accounts and not as fiduciary charges, cannot be treated gently by the criminal justice system.

For all the foregoing reasons, the Government respectfully submits that a sentence within the applicable Guidelines range of 121 to 151 months is necessary and appropriate in this case.

Dated:   New York, New York
         February 23, 2011

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney
                                    Southern District of New York

                                    _____
                                    Michael Bosworth/William Harrington
                                    Assistant United States Attorneys
                                    Tel.: (212) 637-1079/2331